UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

OXFORD HOUSE, INC., ET AL.                     CIVIL ACTION

VERSUS

H. "BUTCH" BROWNING                      NO.: 15-00282-BAJ-EWD

RULING AND ORDER

Before the Court are **Plaintiffs' Motion for Partial Summary Judgment (Doc. 59)** and the **Motion for Partial Summary Judgment (Doc. 55)** filed by Defendant H. "Butch" Browning, in his official capacity as the State Fire Marshal of the Louisiana Office of the State Fire Marshal. Plaintiffs, in their Motion, seek summary judgment on their reasonable accommodation claims under the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act (collectively, "Fair Housing Act"), 42 U.S.C. ch. 45; the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008 (collectively, "ADA"), 42 U.S.C. ch. 126; and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. ch. 16. Defendant filed memoranda in opposition to the Motion, (*see* Docs. 78, 79),[1] and Plaintiffs filed a reply memorandum in support of

---

[1] The Court notes that there is a *single* Defendant in this case: H. "Butch" Browning, whom Plaintiffs have sued in his official capacity as the State Fire Marshal of the Louisiana Office of the State Fire Marshal. *See* Doc. 29 at ¶ 9. Defendant filed two distinct memoranda – drafted by different attorneys – in opposition to Plaintiffs' Motion. *See* Docs. 78, 79. This practice violates this Court's Local Rule 7(f) – which requires "each respondent" to "file *a* response" to a motion, M.D. La. LR 7(f) (emphasis added) – and in effect circumvents the page limitations imposed by Local Rule 7(g), *see* M.D. La. LR 7(g). This practice also resulted in the submission of two distinct statements of material facts as to which Defendant contends there are genuine issues to be tried. *See* Docs. 78-5, 79-1. Although the Court, for the purposes of Plaintiffs' Motion, considered both memoranda and statements of material

1

the Motion, (*see* Doc. 94).    Defendant, in his Motion, seeks summary judgment on

Plaintiffs' reasonable accommodation claim under the Rehabilitation Act.    Plaintiffs

filed a memorandum in opposition to the Motion, (*see* Doc. 80); Defendant filed a reply

memorandum in support of the Motion, (*see* Doc. 86); and Plaintiffs filed a surreply

memorandum in further opposition to the Motion, (*see* Doc. 102).    On June 12, 2017,

the Court held oral argument on the Motions.    For the reasons explained herein,

**Plaintiffs' Motion for Partial Summary Judgment (Doc. 59)** is **GRANTED**, and

Defendant's **Motion for Partial Summary Judgment (Doc. 55)** is **DENIED**.

---

facts submitted by Defendant, Defendant is cautioned that in the future, the Court will strike from
the record any such duplicative pleadings.

## I.    BACKGROUND[2]

### A.    The Oxford House Model

Plaintiff Oxford House, Inc. ("Oxford House, Inc." or "Corporation"), is a 501(c)(3) corporation that provides organizational support to persons attempting to establish group homes for individuals recovering from alcoholism or drug addiction. The first of these group homes – referred to as "Oxford Houses" – was established in

---

[2] Plaintiffs, in connection with their Motion, filed a Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried (Doc. 59-2), outlining 174 paragraphs of facts that Plaintiffs assert as undisputed. Defendant submitted two distinct statements of material facts as to which Defendant contends there are genuine issues to be tried. *See* Docs. 78-5, 79-1. As stated previously, this practice is improper, but for the purposes of Plaintiffs' Motion, the Court considered both statements of material facts submitted by Defendant.

The first of these statements submitted by Defendant addresses each of the paragraphs in Plaintiffs' statement, asserting whether Defendant "controverts" the particular fact, *see, e.g.,* Doc. 78-5 at ¶ 1, or whether the fact is "uncontroverted," *see, e.g., id.* at ¶ 2. Defendant controverted nearly all of the paragraphs in Plaintiffs' statement, reasoning – nearly each time – that the paragraph "attempts to restate, summarize[,] and/or paraphrase testimony of a witness who may be called to testify at trial," *e.g., id.* at ¶ 2, or that the paragraph "references a written document, [which] provides the best evidence of its contents," *e.g., id.* at ¶ 4. These assertions are patently insufficient to aver that a fact is genuinely in dispute. *See* Fed. R. Civ. P. 56(c)(1)(B) ("A party asserting that a fact . . . is genuinely disputed *must support* the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing . . . that an adverse party cannot produce admissible evidence to support the fact." (emphasis added)).

The second of these statements submitted by Defendant provides twenty-seven facts that Defendant apparently asserts as undisputed; these facts are supported by citations to exhibits that were submitted by Defendant. *See* Doc. 79-1. Some of these facts, however, are materially identical to facts that Plaintiffs assert as undisputed. *Compare, e.g., id.* at ¶ 1 ("In 2014, the [Louisiana Office of the State Fire Marshal] received a citizen complaint concerning Oxford Houses in Lake Charles, L[ouisiana]."), *with* Doc. 59-2 at ¶ 70 ("In January 2014, the Louisiana Office of the State Fire Marshal received a citizen complaint about houses in Lake Charles being used as 'halfway[-]type facilities.'").

Therefore, the vast majority of the facts that Plaintiffs assert as undisputed in their Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried (Doc. 59-2) are considered by the Court as undisputed for the purposes of Plaintiffs' Motion, either due to Defendant's failure to properly support its assertion that the facts are genuinely disputed or Defendant's apparent agreement that various facts are undisputed. *See* Fed. R. Civ. P. 56(c). If the Court has determined that Defendant has *properly* disputed a particular fact that is recounted in this section, the Court will indicate the existence of the dispute in the corresponding footnote and will include a record citation to the exhibits submitted by the parties.

1976. Since that time, and due to congressional recognition of the effectiveness of Oxford Houses, Oxford House, Inc., has entered into contracts with a majority of states – including the State of Louisiana – to establish and maintain Oxford Houses. States do not provide any direct funding to individual Oxford Houses; states merely provide funding to subsidize the salaries of persons who facilitate the establishment of Oxford Houses within the state. At the time that Plaintiffs filed this Motion, 106 Oxford Houses were operating in Louisiana, including six in the Lake Charles area. In total, over 700 individuals resided in Oxford Houses in Louisiana at that time, but many more individuals sought to reside in those homes: in 2016, Oxford Houses in Louisiana received four applications for every vacancy. Oxford House residents in Louisiana – 20% of whom come directly from homelessness and 16% of whom come directly from incarceration, commitment in a mental health facility, or residency in a halfway house – tend to stay in an Oxford House for an average of eleven months.

In order to reside in an Oxford House, an individual must be in recovery from alcoholism or drug addiction. The existing residents of a particular Oxford House vote to accept or deny the application of an individual seeking to reside in the home. An applicant who is currently using drugs or alcohol is disqualified from admission to an Oxford House, and any existing residents who relapse into drug or alcohol use are required to vacate the home.

Oxford House, Inc., provides no direct financial assistance to individual Oxford Houses; each individual Oxford House must be financially self-reliant. Nor does Oxford House, Inc., own property. Rather, the mission of Oxford House, Inc., is to

4

*encourage* groups of individuals who are recovering from alcoholism or drug addiction to lease homes, live together, affiliate with the Corporation's network, and utilize the Oxford House model. The Corporation endeavors to establish Oxford Houses in single-family homes located in residential neighborhoods, ideally with common areas that are large enough to accommodate all of the residents of the home during "house meetings" and informal gatherings. Oxford Houses typically are established in homes with four bedrooms, and residents customarily share bedrooms. In order for residents to fulfill both the responsibilities for the continued functioning of the home and the mission of the home to foster its residents' recovery, Oxford Houses must lodge at least six individuals. Five residents are charged with officer positions, entrusted with particular responsibilities and duties.

### B.     The Beneficial Effects of the Oxford House Model

The Oxford House model aims to facilitate the development of relationships among residents that resemble familial bonds. This aim is accomplished through the layout of homes and the lodging in a single-family home of several individuals who are all recovering from alcoholism or drug addiction: residents can avoid feelings of isolation and loneliness – which have been shown to contribute to relapse – by sharing bedrooms and by having the ability to congregate and socialize in communal living spaces. Oxford Houses provide stable housing for individuals recovering from alcoholism or drug addiction, and the communal living arrangement encourages residents to hold each other accountable for their actions in order to prevent relapse.

For example, Plaintiff Dana Daniel ("Daniel") – who has suffered from an addiction to opioids for her entire adult life, detrimentally affecting her finances, personal and familial relationships, and housing situation – has described the Oxford House model as providing a "safe place . . . to go" for persons recovering from alcoholism or drug addiction.[3]  Daniel, who has resided at multiple Oxford Houses, explained that the presence of "other people . . . that are striving to . . . have healthy lives and recover . . . h[e]ld[] [her] accountable" and provided her with "guidance."[4] Daniel also credited the responsibilities conferred by the elected officer positions with promoting her sense of accountability to others.  "You learn responsibility," stated Daniel.[5]

Additionally, the Oxford House model aids residents in repairing relationships that have been negatively affected by their alcoholism or drug addictions.  Courtney Catanese ("Catanese") – who, at the time of Plaintiffs' Motion, had maintained sobriety for a one-year period since moving into Oxford Houses – described her recent success in attempting to repair the familial relationships that she had damaged during the period of her addiction.[6]

---

[3] Doc. 59-7 at p. 15, l. 22.

[4] *Id.* at p. 15, ll. 23-25; *id.* at p. 16, l. 2.

[5] *Id.* at p. 70, ll. 21-22.

[6] Doc. 59-6 at ¶ 7.

The effectiveness of the Oxford House model in preventing an individual's relapse into drug and alcohol use has been confirmed by an academic study.[7]  In a longitudinal study, researchers observed 897 Oxford House residents who resided in 219 Oxford Houses nationwide over the course of a year.  Researchers found that the relapse rate for these Oxford House residents was 13.5%.  The finding that over 86% of the observed Oxford House residents retained their sobriety throughout the study represents an outcome that is at least four times greater than normal outcomes following traditional detoxification and addiction treatment.

### C.     Oxford House West Hale

In 2012, an Oxford House was established in a house located at 236 West Hale Street in Lake Charles, Louisiana ("Oxford House West Hale").  The house is owned by Plaintiffs David and Janet Miller (collectively, "the Millers"), who lease the property to the residents for $1500 per month.

The house is a one-story, single-family home and is located in a residential neighborhood.  The house has four bedrooms, two bathrooms, a living and dining area, a kitchen, and a garage.  Each of the bedrooms either features a window or an exterior door, and the living and dining area, as well as the garage, has an exterior door.  The house contains connected smoke detectors and fire extinguishers, but it does not have a sprinkler system, a fire alarm system, or single-station smoke alarms that are powered by the house's electrical infrastructure.

---

[7] *See* Leonard A. Jason et al., *The Need for Substance Abuse After-Care:  Longitudinal Analysis of Oxford House*, 32 Addictive Behavs. 803 (2007).

Oxford House West Hale operates as an all-female Oxford House. Due to the house's layout, a maximum of seven women may reside in the home. Catanese, at the time of Plaintiffs' Motion, resided at Oxford House West Hale and served as its "President." Daniel previously resided at Oxford House West Hale from December 2014 to May 2015.

In addition to holding weekly "house meetings" to discuss the management of the house, the residents of Oxford House West Hale socialize with each other on a daily basis, both inside and outside of the house. The residents often congregate on the house's patio, discussing their efforts to recover from their addictions and to remain sober. Residents also accompany each other to meetings of the local chapters of Alcoholics Anonymous and Narcotics Anonymous, at which the residents present to those in attendance the availability of Oxford Houses as an option for those seeking to retain their sobriety. Apart from these recovery- and house-management-related interactions, residents dine with each other in nearby restaurants and see movies together. Residents of Oxford House West Hale "become very close" with each other,[8] and they maintain some of these tight-knit relationships even after leaving the house. "We . . . know all of each other's personal details, . . . and we hold each other accountable," stated Catanese.[9]

Each resident at Oxford House West Hale pays $125 per week to reside in the house. Both Daniel and Catanese have stated that they could not afford a higher

---

[8] Doc. 59-6 at ¶ 11.

[9] *Id.*

8

weekly payment, and Catanese has stated that the other residents of the house likewise could not afford a higher weekly payment, based on her knowledge that each of the residents of the house was at least one week behind on her respective payments. The funds from such payments are used to satisfy monthly obligations, such as rent and utilities bills, and to purchase basic household supplies. The remainder of the funds are placed in a reserve, to be used in the event of vacancies or emergencies. At the time of Plaintiffs' Motion, Oxford House West Hale's bank account had a balance of $682.37, and the house had no alternative access to funding. Additionally, Oxford House West Hale was not financially stable at the time of Plaintiffs' Motion, which was at least in part due to recent vacancies that had arisen; four residents must be lodged in the house and making payments in order for Oxford House West Hale to exhibit financial stability.

### D.    Louisiana Office of the State Fire Marshal

The Louisiana Office of the State Fire Marshal ("Fire Marshal") is an agency of the State of Louisiana, organized within the Department of Public Safety and Corrections. H. "Butch" Browning ("Fire Marshal Browning") serves as the State Fire Marshal. The Fire Marshal, as a result of a grant from the United States Department of Housing and Urban Development, is a recipient of federal funding. The Fire Marshal is statutorily tasked with enforcing and promulgating rules and regulations with which structures in the state must comply,[10] although the Fire Marshal does not

---

[10] *See* La. Rev. Stat. § 40:1578.6(A).

9

have the statutory authority to inspect "one- or two-family dwellings . . . for the purpose of reducing or eliminating fire hazards."[11]

By statute, the State of Louisiana utilizes the provisions of the Life Safety Code as the minimum standards of fire safety with which all structures must comply, and the Fire Marshal is statutorily charged to enforce those provisions.[12] The Life Safety Code, sometimes referred to as "NFPA 101," is published by the National Fire Protection Association. At all times relevant to this action, the Fire Marshal utilized the 2012 edition of the Life Safety Code.[13]

The provisions of the Life Safety Code prescribe requirements with which structures must comply to ensure fire safety. The requirements applicable to a structure depend primarily on that structure's "occupancy type," such as "one- or two-family dwelling," "lodging or rooming house," or "residential board and care facility." In general, the Life Safety Code prescribes the least onerous requirements on one- and two-family dwellings, with the requirements becoming more exacting as the number of occupants in and the public access to a structure increases.

---

[11] *Id.* § 40:1563(B)(4).

[12] *See id.* § 40:1578.6(A).

[13] *See* Life Safety Code (Nat'l Fire Prot. Ass'n 2012).

## E.    Citizen Complaint

In January 2014, the Fire Marshal received a citizen complaint regarding various houses in Lake Charles, which the citizen alleged were operating as "halfway[-]type facilities." Oxford House West Hale was one of the houses referenced in the complaint.

On March 10, 2014, Deputy Roddy Dauzat ("Deputy Dauzat"), along with other Fire Marshal employees, arrived at the house located at 3711 Swanee Street ("3711 Swanee") in Lake Charles – which had been included in the citizen complaint – to inspect the residence. An Oxford House had been established at 3711 Swanee, and during the course of the inspection, Deputy Dauzat was placed in contact with Paul Malloy ("Malloy"), the Chief Executive Officer of Oxford House, Inc. Malloy advised Deputy Dauzat that 3711 Swanee was a one-family dwelling, not a lodging or rooming house, and that the Fire Marshal thus had no authority to inspect the residence. Further, Malloy asserted that the current configuration of 3711 Swanee was protected under the Fair Housing Act, and later that day, Malloy sent a legal memorandum to the Fire Marshal to support that position. Deputy Dauzat thereafter ceased the inspection, and the scheduled inspections of the other Oxford Houses in the Lake Charles area were postponed, pending a review by the Fire Marshal of its authority to inspect the residences.

In October 2014, Fire Marshal Browning and Malloy held a teleconference to discuss matters related to the Fire Marshal's desire to inspect the Oxford Houses in Lake Charles. Following that teleconference, Fire Marshal Browning informed

11

Malloy via email that the Fire Marshal held the position that the Oxford Houses may be properly classified as lodging or rooming houses or residential board and care facilities, and therefore the Fire Marshal had the statutory authority to inspect the structures.

### F.     "Reasonable Accommodation Request" of January 12, 2015

On January 12, 2015, Steven G. Polin ("Polin") – General Counsel of Oxford House, Inc. – sent a letter to Fire Marshal Browning. The letter – which is thirteen-pages long and is replete with legal citations – contained the words "Reasonable Accommodation Request" in the subject line, and Polin stated that he was "making a reasonable accommodation request pursuant to the . . . Fair Housing Act, 42 U.S.C. [§] 3604(f)(3)(B)."[14] Specifically, Polin requested that the Fire Marshal "waive . . . the limitations of the maximum number of unrelated persons who can reside together as a family under the . . . [L]ife [S]afety [C]ode . . . and treat the use of Oxford House as the functional equivalent of a family . . . and the use of the property as a single[-] family use."[15] In support of the contention that the residents of Oxford Houses should be treated as the "functional equivalent of a family," Polin stated:

> First, all the residents have access to the entire house. Second, all the residents participate equally in the housekeeping functions of the house . . . . Third is the quality of the relationship among the residents. The emotional and mutual support and bonding [of] Oxford House residents in support of their recovery from drug addiction and alcoholism is the equivalent of the type of love and support received in a traditional family. Finally, the living arrangement is not based upon a profit motive. It is necessary that that the proposed Oxford House be able to have a minimum of six (6) residents in order for the residents to ameliorate the effects of the diseases of alcoholism and drug

---

[14] Doc. 59-21 at p. 1.

[15] *Id.*

12

addiction. . . .  By living with other persons who are in recovery, the residents should never have to face an alcoholic's or addict's deadliest enemy:  loneliness and isolation.[16]

A response to this letter was never received by any representative of Oxford House, Inc.  On March 24, 2015, Fire Marshal Browning made the determination that the Fire Marshal should proceed with the inspection process of the Oxford Houses.  The Fire Marshal did not provide notice to any persons associated with Oxford House, Inc., regarding the resumption of the inspection process.

### G.    Fire Marshal's Inspection of Oxford House West Hale

On April 28, 2015, Fire Marshal employees inspected Oxford House West Hale. Based on the information obtained from the inspection, the Fire Marshal determined that the structure's occupancy type was a lodging or rooming house, due to the residency of six unrelated persons in the house.  The Fire Marshal then ordered the Millers to reduce the number of unrelated occupants in the house to three within twenty-four hours and to submit a plan to the Fire Marshal to change the occupancy type of the house from a one-family dwelling to a lodging or rooming house.

Plaintiffs thereafter initiated this action on May 1, 2015.

### H.    "Reasonable Accommodation Request/Plan Review" of October 9, 2015

On May 5, 2015, the Fire Marshal advised Polin that it did not have a formal process for reviewing requests for reasonable accommodations; rather, the Fire Marshal only considers "plan review" applications, the purpose of which are to change the occupancy type of a structure.

---

[16] *Id*. at p. 4.

On October 9, 2015, Polin sent a letter on behalf of Oxford House West Hale to Mindy Nunez Duffourc, who was representing the Fire Marshal. The letter contained the words "Reasonable Accommodation Request/Plan Review" in the subject line, and Polin stated that he was "request[ing] that the . . . Fire Marshal make a reasonable accommodation pursuant to the . . . Fair Housing Act, 42 U.S.C. [§] 3604(f)(3)(B)."[17] In particular, Polin requested that the Fire Marshal "waive the limitations of the maximum number of unrelated persons who can reside together as a family under the . . . [L]ife [S]afety [C]ode" and "treat the use of Oxford House as the functional equivalent of a family . . . and the use of the property as a single[-]family use."[18] In addition to incorporating the information contained in his letter dated January 12, 2015, Polin attached to the letter a copy of the *Oxford House Manual*, the lease agreement between the Millers and Oxford House West Hale, and a floor plan of the structure.[19]

After reviewing the "Reasonable Accommodation Request/Plan Review," on November 3, 2015, the Fire Marshal sent to the Millers a "Building Rehabilitation" letter. The letter stated that the Fire Marshal had reviewed Polin's correspondence as a request to change the occupancy type of the Oxford House West Hale structure from a one- or two-family dwelling to a lodging or rooming house. This letter also stated the various deficiencies – such as the lack of an automatic sprinkler system, a

---

[17] Doc. 59-25 at p. 5.

[18] *Id.*

[19] *See id.* at pp. 5-61.

fire alarm system, and single-station smoke alarms powered by the building's electrical system – that the Millers were required to ameliorate in order to comply with the requirements that the Life Safety Code prescribes for lodging or rooming houses. Additionally, the letter stated that the structure could not be occupied by any persons until the various deficiencies were corrected.

Plaintiffs assert that the Fire Marshal's response to their requests was a refusal of an accommodation that is reasonable as a matter of law, in violation of the Fair Housing Act, the ADA, and the Rehabilitation Act.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record [–] including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, [and] interrogatory answers" – or by averring that an adverse party cannot produce admissible evidence to support the presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1).

"[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnote omitted). "This burden is not satisfied with some metaphysical

doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal quotation marks and citations omitted). In determining whether the movant is entitled to summary judgment, the Court "view[s] facts in the light most favorable to the non-movant and draw[s] all reasonable inferences in her favor." *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

In sum, summary judgment is appropriate if, "after adequate time for discovery and upon motion, [the non-movant] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

The residents of Oxford House West Hale are individuals whose lives have been devastated by the effects of alcoholism and drug addiction. They seek to live together in a single-family home – in which they can provide mutual support to one another – to further their recovery, stave off the always-imminent threat of relapse, and regain their dignity.

Defendant repeatedly argues that by requiring the residents of Oxford House West Hale to install extensive and costly fire safety features in order to remain in their home, "Plaintiffs are being treated no different from any other group of seven unrelated individuals who want to live in a house, wherever that house may be located." (Doc. 79 at p. 10). Because of their struggles with alcoholism and drug addiction, however, these individuals *are* different, and by imposing upon Defendant the obligation to make reasonable accommodations for such persons, the law *requires* Defendant to treat these individuals differently.

### A.   Analysis of Reasonable Accommodation Claims Under the Fair Housing Act, the ADA, and the Rehabilitation Act

"The purpose of the [Fair Housing Amendments] Act was to prohibit discrimination in the national housing market for handicapped individuals," *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 200-01 (5th Cir. 2000) (footnote omitted), thereby bringing handicapped individuals within the Fair Housing Act's "broad and inclusive compass" to eliminate housing discrimination in the United States, *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995). Similarly, the ADA – as well as the Rehabilitation Act, which is "interpreted *in pari materia*" with the ADA –

17

"is a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals . . . and to integrate them into the economic and social mainstream of American life." *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)) (internal quotation marks omitted).

Pursuant to the Fair Housing Act, unlawful discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Additionally, "both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). "Because '[t]he relevant portions of the [Fair Housing Act], [the] ADA, and . . . the Rehabilitation Act offer the same guarantee that a covered entity . . . must provide reasonable accommodations . . . to people with disabilities,' 'analysis of a reasonable accommodation claim under the three statutes is treated the same.'" *Logan v. Matveevski*, 57 F. Supp. 3d 234, 253 (S.D.N.Y. 2014) (quoting *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 337 (E.D.N.Y. 2012)) (alteration in original); *see also Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003) ("Due to the similarities between the [Fair Housing Act and the ADA], we interpret them in tandem."); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003) ("As a preliminary matter[,] the requirements for showing

18

failure to reasonably accommodate are the same under the ADA and the [Fair Housing Act,] so we can treat these issues as one."); *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002) ("[T]here is no significant difference in the analysis of rights and obligations created by the [ADA and the Rehabilitation Act]."); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 334 (2d Cir. 1995) ("We believe that in enacting the anti-discrimination provisions of the [Fair Housing Amendments Act], Congress relied on the standard of reasonable accommodation developed under section 504 of the Rehabilitation Act . . . .").

Although subtle textual nuances of the Rehabilitation Act distinguish it from the other statutes, these nuances do not affect the Court's ability to treat Plaintiffs' reasonable accommodation claims under the Fair Housing Act, the ADA, and the Rehabilitation Act as a single claim for purposes of analysis, nor do those nuances defeat Plaintiffs' reasonable accommodation claim under the Rehabilitation Act. For example, the ADA and the Rehabilitation Act contain differing causation standards for a plaintiff to prevail on a disability-based discrimination claim: the Rehabilitation Act employs a sole-causation standard, while the ADA does *not* require that "discrimination . . . be the sole reason' for the exclusion or denial of benefits to the plaintiff." *Bennett-Nelson*, 431 F.3d at 454 (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503-04 (5th Cir. 2002)).    The sole-causation standard of the Rehabilitation Act, however, is not relevant to the analysis of a reasonable accommodation claim under that statute. *See id.* at 454-55 ("Where a defendant fails

to meet [the] affirmative obligation [to make reasonable accommodations for disabled individuals], the *cause* of that failure is *irrelevant*." (emphasis added)).

As an additional example, the prohibition of discriminatory treatment under the Rehabilitation Act applies only to "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Program or activity" is defined by the statute as "all the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance funds." *Id.* § 794(b)(1)(A). Therefore, if Defendant receives any type of federal funding, this nuance of the Rehabilitation Act likewise does not disturb the Court's analysis of Plaintiffs' reasonable accommodation claims under the Fair Housing Act, the ADA, and the Rehabilitation Act as a single claim, nor would Plaintiffs' reasonable accommodation claim under the Rehabilitation Act be defeated.

Defendant asserts in his Motion that he is entitled to summary judgment on Plaintiffs' reasonable accommodation claim under the Rehabilitation Act because (1) Plaintiffs cannot demonstrate that they were subjected to discrimination *solely* because of their alleged disabilities and (2) Plaintiffs cannot prove any connection between the alleged discrimination and a federally funded program.[20]  Because

---

[20] Defendant, in his reply memorandum in support of his Motion, additionally argued that (1) Plaintiffs cannot establish intentional discrimination under the Rehabilitation Act, (2) Plaintiffs' reasonable accommodation claim under the Rehabilitation Act must be dismissed because their request for an "accommodation" was not reasonable as a matter of law, and (3) Plaintiffs failed to establish a disparate impact claim under the Rehabilitation Act. *See* Doc. 86. Because these arguments were raised by Defendant for the first time in his reply memorandum, the Court will not consider these new arguments. *See John Deere Co. v. Am. Nat'l Bank, Stafford*, 809 F.2d 1190, 1192 (5th Cir. 1987); *Elwakin v. Target Media Partners Operating Co.*, 901 F. Supp. 2d 730, 745 (E.D. La. 2012).

Defendant has based his arguments on an apparent misapprehension of the law applicable to Plaintiffs' claim, Defendant is not entitled to summary judgment on Plaintiffs' reasonable accommodation claim under the Rehabilitation Act.

Defendant argues that he is entitled to summary judgment because "[P]laintiffs cannot show that the alleged discriminatory act, a failure to waive provisions, was based *solely* upon their alleged disability,"[21] as Defendant asserts is required for Plaintiffs to prevail on their reasonable accommodation claim under the Rehabilitation Act. (Doc. 55-1 at p. 7). As stated above, the sole-causation standard is "irrelevant" to Plaintiffs' reasonable accommodation claim under the Rehabilitation Act. *Bennett-Nelson*, 431 F.3d at 454-55. Therefore, because Defendant has cited an inapplicable legal standard in support of his assertion that he is entitled to judgment as a matter of law, Defendant has failed to satisfy his burden under Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. P. 56(a) ("The [C]ourt shall grant summary judgment if the movant *shows* that . . . the movant is entitled to judgment as a matter of law." (emphasis added)).

Although it is undisputed that the Fire Marshal receives federal funding, (*see* Doc. 80-1 at p. 3), Defendant argues that he is entitled to summary judgment on Plaintiffs' reasonable accommodation claim under the Rehabilitation Act because the federal funding is "used exclusively to implement and manage a Federal

---

[21] Defendant asserts that Plaintiffs "failed to (1) utilize the [Fire Marshal]'s appeal process or (2) propose an equivalence whereby other safety measures could be used to meet the requisite safety standards of the [Life Safety Code]." Doc. 55-1 at p. 8. Defendant contends that these "failures" demonstrate that Defendant's refusal to make an "accommodation" was not *solely* based on Plaintiffs' disabilities. *See id.*

Manufactured Housing Program and an Information Management System," neither
of which relate to the alleged discrimination against Plaintiffs, (Doc. 55-1 at p. 12).
Defendant avers that Plaintiffs must demonstrate a relation between those two
particular programs and the alleged discrimination to state a claim under the
Rehabilitation Act.

This argument is based on law that has been overturned by Congress's passage
of the Civil Rights Restoration Act of 1987 ("Civil Rights Restoration Act"), Pub. L.
No. 100-259, § 4, 102 Stat. 28, 29-30 (1988) (codified at 29 U.S.C. § 794(b)).[22] *See
Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551 F.3d 193, 199-200 (3d Cir.
2008). The Rehabilitation Act's prohibition of discriminatory treatment, by the clear
wording of the statute, applies to "*all of the operations of*" the Fire Marshal, which
clearly is a "department, agency, special purpose district, or other instrumentality of

---

[22] "Program or activity" is defined by the text of the Rehabilitation Act as "all the operations of . . . a
department, agency, special purpose district, or other instrumentality of a State or of a local
government . . . any part of which is extended Federal financial assistance funds." 29 U.S.C. §
794(b)(1)(A). Congress promulgated this definition of "program or activity" in section 4 of the Civil
Rights Restoration Act. *See* 102 Stat. at 29-30. The relevant Senate Report states that Congress
promulgated this definition of "program or activity" explicitly to "overturn the Supreme Court's 1984
decision in *Grove City College v. Bell*, 465 U.S. 555 [(1984)]," which "severely narrow[ed] the
application of coverage of . . . Section 504 of the Rehabilitation Act of 1973." S. Rep. No. 100-64, at 2
(1987).

The holding in *Grove City* required a plaintiff – to state a claim under Title IX of the Education
Amendments of 1972, 20 U.S.C. ch. 38 – to demonstrate that she was discriminated against by a
particular *program* of a state or institutional entity, rather than a state or institutional entity as a
whole, that received federal funding. *See* 465 U.S. at 571. The Supreme Court, in *Consolidated Rail
Corp. v. Darrone*, 465 U.S. 624 (1984), decided during the same Term, extended the holding of *Grove
City* to claims under the Rehabilitation Act, determining that the "ban on discrimination" applies only
"to the specific program that receives federal funds." *Id.* at 636.

Therefore, in overturning the Supreme Court's holding in *Grove City*, Congress also overturned the
Court's holding in *Consolidated Rail* through the promulgation of the new definition of "program or
activity" in the Civil Rights Restoration Act. *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551
F.3d 193, 199-200 (3d Cir. 2008) (recognizing that Congress overturned the holding of *Consolidated
Rail* through the passage of the Civil Rights Restoration Act).

a State or of a local government . . . any part of which is extended Federal financial assistance funds." 29 U.S.C. § 794(b)(1)(A) (emphasis added). Defendant's argument therefore is based on overturned law, and thus Defendant has failed to satisfy his burden under Rule 56. *See* Fed. R. Civ. P. 56(a) ("The [C]ourt shall grant summary judgment if the movant *shows* that . . . the movant is entitled to judgment as a matter of law." (emphasis added)).

## B.    Plaintiffs' Reasonable Accommodation Claims

In order for the Court to find that Plaintiffs are entitled to summary judgment on their reasonable accommodation claims under the Fair Housing Act, the ADA, and the Rehabilitation Act – which the Court, for analytical purposes, treats as a single claim – Plaintiffs must demonstrate that, as a matter of law, (1) the residents of Oxford House West Hale are "handicapped" or "disabled," as the statutes define those terms; (2) Plaintiffs requested an accommodation, and Defendant refused that request; (3) the requested accommodation was reasonable; and (4) the requested accommodation "may be necessary to afford" the residents of Oxford House West Hale "equal opportunity to use and enjoy a dwelling." *Oxford House, Inc. v. City of Baton Rouge*, 932 F. Supp. 2d 683, 687-94 (M.D. La. 2013) (quoting 42 U.S.C. § 3604(f)(3)(B)). Plaintiffs have demonstrated that there is "no genuine dispute as to any material fact" regarding each of the elements of their reasonable accommodation claims and that they are "entitled to judgment as a matter of law" on those claims. Fed. R. Civ. P. 56(a).

### 1.    *Handicap or Disability*

Under the Fair Housing Act, a "handicap" is defined as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h). Under the statute, "current, illegal use of or addiction to a controlled substance" is not considered a "handicap." *Id.* Similarly, the ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual[,] (B) a record of such an impairment[,] or (C) being regarded as having such an impairment." *Id.* § 12102(1). "Major life activities," as that term is used in the definition of "disability" under the ADA, include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). The Rehabilitation Act, for purposes of establishing a reasonable accommodation claim, utilizes the definition of "disability" that is promulgated under the ADA. *See* 29 U.S.C. § 705(9)(B).

Although alcoholism and drug addiction are "impairments" under the statutes, "there is no *per se* rule that categorizes recovering alcoholics and drug addicts as disabled or handicapped, and a case-by-case evaluation is necessary" because "mere status as an alcoholic or substance abuser does not necessarily imply a 'limitation' under the second part of [the] definition" of a "handicap" or "disability" under the

statutes. *Oxford House*, 932 F. Supp. 2d at 688-89 (quoting *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 47 (2d Cir. 2002)).

The Court finds that the residents of Oxford House West Hale are "handicapped" or "disabled" within the meaning of those terms as used in the Fair Housing Act, the ADA, and the Rehabilitation Act. Daniel's impairment – an addiction to opioids, (*see* Doc. 59-7 at p. 10, ll. 2-4) – rendered her unable to maintain steady employment; over the course of one year, Daniel held twelve different jobs, was discharged from many of those jobs due to complications caused by her addiction, and resigned from the other positions knowing that she inevitably would be discharged, (*see id.* at p. 68, ll. 1-8). Daniel also could not maintain stable housing as a result of her impairment, renting rooms from various persons for short periods of time. (*See id.* at p. 69, ll. 14-20). Catanese, a current resident of Oxford House West Hale, endured periods of homelessness as a result of her impairment, (Doc. 59-6 at ¶ 7) – substance abuse, (*id.* at ¶ 6). Catanese also suffered from economic distress during her addiction, spending "every penny" on drugs. (*Id.* at ¶ 7). Because of the nature of the necessary criteria that an applicant must meet in order to reside at Oxford House West Hale, all of the residents are recovering from alcoholism or drug addiction, and the experiences of Daniel and Catanese during the times of their addictions therefore are representative of the residents' experiences generally.

Given the substantial limitation, as a result of their addictions, that was placed on the ability of the Oxford House West Hale residents to maintain steady employment and housing and to retain adequate finances to support themselves –

which are "major life activities" – the residents of Oxford House West Hale are "handicapped" or "disabled" within the definition of those terms under the Fair Housing Act, the ADA, and the Rehabilitation Act. *See* 42 U.S.C. § 3602(h); *id.* § 12102(1), (2)(A); *see also Oxford House*, 932 F. Supp. 2d at 689 (finding that the residents of an Oxford House were "handicapped" or "disabled" for purposes of the Fair Housing Act and the ADA because the residents could not maintain stable housing outside the Oxford House due to the inevitability of relapse).  Defendant thus has failed to demonstrate that there is a "genuine issue for trial" regarding the residents' status as "handicapped" or "disabled" persons. *Anderson*, 477 U.S. at 250.

### 2.    *Refusal of a Requested Accommodation*

In order to demonstrate that Defendant "refused" their requested accommodation, Plaintiffs must demonstrate that they "requested an accommodation and . . . [D]efendant refused it." *Oxford House*, 932 F. Supp. 2d at 690. "[P]laintiffs must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to adjust the neutral policy in question." *Tsombanidis*, 352 F.3d at 578. "It may be that once the governmental entity denies such an accommodation, neither the [Fair Housing Act] nor the ADA require[s] a plaintiff to *exhaust* the state or local administrative procedures . . . [b]ut a plaintiff must first use the procedures available to notify the governmental entity that it seeks an exception or variance from the facially neutral laws when pursuing a reasonable accommodation claim." *Id.* at 579.

The record reflects that Plaintiffs directed two requests for an accommodation to the Fire Marshal, first on January 12, 2015, and again on October 9, 2015. (*See* Docs. 59-21, 59-25). In the first request – which contained the words "Reasonable Accommodation Request" in the subject line – Polin, representing Oxford House, Inc., stated that he was "making a reasonable accommodation request pursuant to the . . . Fair Housing Act, 42 U.S.C. [§] 3604(f)(3)(B)." (Doc. 59-21 at p. 1). Specifically, Polin requested that the Fire Marshal "waive . . . the limitations of the maximum number of unrelated persons who can reside together as a family under the . . . [L]ife [S]afety [C]ode . . . and treat the use of Oxford House as the functional equivalent of a family . . . and the use of the property as a single[-]family use." (*Id.*). Neither a response to this letter nor notice regarding the resumption of the inspection process was ever received by a representative of Oxford House, Inc., before Fire Marshal employees arrived at Oxford House West Hale to inspect the residence on April 28, 2015. (Doc. 59-3 at ¶ 34).

After the submission of the first request for an accommodation, the Fire Marshal informed Polin that it did not have a process to evaluate and review requests for accommodations. (Doc. 59-20 at ¶ 4). The Fire Marshal further advised Polin that it would only consider such requests in the form of "plan review" applications. (*Id.* at ¶ 5). Polin then followed the advice provided by the Fire Marshal regarding its own processes and submitted, on October 9, 2015, a document that contained the words "Reasonable Accommodation Request/Plan Review" in the subject line. (Doc. 59-25 at p. 5). In the document, Polin stated that he was "request[ing] that the . . . Fire

27

Marshal make a reasonable accommodation pursuant to the . . . Fair Housing Act, 42 U.S.C. [§] 3604(f)(3)(B)." (*Id.*) In particular, Polin requested that the Fire Marshal "waive the limitations of the maximum number of unrelated persons who can reside together as a family under the . . . [L]ife [S]afety [C]ode" and "treat the use of Oxford House as the functional equivalent of a family . . . and the use of the property as a single[-]family use." (*Id.*) Polin attached to the document a copy of the *Oxford House Manual*, the lease agreement between the Millers and Oxford House West Hale, and a floor plan of the structure. (*See id.* at pp. 5-61). The Fire Marshal responded to this request by sending a "Building Rehabilitation" letter to the Millers, stating that the Fire Marshal treated the request as a petition to change the occupancy type of the Oxford House West Hale structure from a one- or two-family dwelling to a lodging or rooming house and demanding that the Millers ameliorate various deficiencies to comply with the requirements that the Life Safety Code prescribes for lodging or rooming houses. (*See* Doc. 59-26 at ¶¶ 1-7).

This response was a specific refusal of Plaintiffs' very particularized request for an accommodation to "use the . . . property as a single[-]family [dwelling]," (Doc. 59-25 at p. 5): the Fire Marshal's response disregarded Plaintiffs' request that the structure continue to be classified as a one-family dwelling and demanded that the Millers bring the structure into conformity with the Life Safety Code's provisions regarding lodging or rooming houses, (*see* Doc. 59-26 at ¶¶ 1-7). Plaintiffs therefore have demonstrated that they used the procedure that the Fire Marshal itself stated was the only means available to submit a request for an accommodation, and the Fire

Marshal refused that request. *See id.* Defendant thus has failed to demonstrate that there is a "genuine issue for trial" regarding the Fire Marshal's refusal of Plaintiffs' requested accommodation. *Anderson*, 477 U.S. at 250.

### 3.    *Reasonableness of the Requested Accommodation*

"An accommodation is reasonable if it 'does not cause any undue hardship or fiscal or administrative burdens on the [governmental entity] or does not undermine the basic purpose that the [challenged regulation] seeks to achieve.'" *Oxford House*, 932 F. Supp. 2d at 692 (quoting *Oxford House, Inc. v. Town of Babylon*, 819 F. Supp. 1179, 1186 (E.D.N.Y. 1993)).

In essence, Plaintiffs have requested, as an accommodation, that the Fire Marshal interpret the term "family" – as that term is used in the Life Safety Code – in a manner that would capture the type of relationship shared among the residents of Oxford House West Hale, which consequently would permit the Oxford House West Hale structure to remain classified as a one-family dwelling. It is undisputed that no undue hardship or fiscal or administrative burdens would result if the Fire Marshal interpreted the term "family" in such a way. (*See* Doc. 59-11 at p. 67, ll. 9-14). Therefore, the crucial question that this case presents is whether interpreting the term "family" in a manner that would capture the type of relationship shared among the residents of Oxford House West Hale would undermine the basic purpose that the Life Safety Code seeks to achieve.

The Life Safety Code defines a "one- or two-family dwelling" as a "building[] containing not more than two dwelling units in which each dwelling unit is occupied

by members of a single family with not more than three outsiders, if any, accommodated in rented rooms." Life Safety Code ¶ 24.1.1.1 (Nat'l Fire Prot. Ass'n 2012). The Life Safety Code specifically states that it "does not define the term family." *Id.* ¶ A.24.1.1.1. Rather, the Life Safety Code states that "[t]he definition of family is subject to federal, state, and local regulations and might not be restricted to a person or a couple (two people) and their children." *Id.* In addition to not defining the term "family," the Life Safety Code does not limit the number of persons who may be considered members of a "family." *See id.*

The Fire Marshal is vested with the power to interpret the provisions of the Life Safety Code,[23] which the State of Louisiana has adopted as the minimum standards of fire safety with which all structures must comply. *See* La. Rev. Stat. § 40:1578.6(A). (*Id.* at p. 45, ll. 15-20). The Fire Marshal defines "family," as that term is used in the Life Safety Code, as "a householder and one or more people living in the same household who are related to [the] householder by birth, marriage, or adoption." (Doc. 59-10 at pp. 15-16). According to the Fire Marshal, this definition is derived from the definition utilized by the United States Census Bureau and the definition provided in Louisiana Revised Statutes section 46:2121.1, which states that for the purposes of laws relating to family violence shelters, "'family or household members' means spouses, former spouses, parents, children, stepparents,

---

[23] In fact, the Fire Marshal previously has issued interpretive guidance on the definition of a "one- or two-family dwelling." *See* Doc. 59-30. In "Interpretive Memorandum 2011-04," the Fire Marshal "reason[ed] that a single building owner is allowed to rent to a maximum of 3 outsiders," and even though that "would place a total of 4 non-related persons in [a] sleeping facility," the structure could retain its "classification as a single[-]family residence." *Id.*

stepchildren, foster parents, and foster children[, as well as] grandparents or their grandchildren." *Id.* § 46:2121.1. (*Id.*).

Defendant contends that the requested accommodation – the interpretation of the term "family" in a manner that would capture the type of relationship shared among the residents of Oxford House West Hale – would increase the potential danger to the residents that is presented by the risk of fire, which would undermine both the purpose of the Life Safety Code and the Fire Marshal's statutory mandate to "take all steps necessary and proper to protect life and property from the hazards of fire and of panic which may arise from fire or from the threat of fire or explosion." *Id.* § 40:1563(A). Defendant's primary argument is that in order to ensure fire safety in one-family dwellings, a crucial characteristic of a "family" is the presence of a "head or manager" and a hierarchal structure, both of which the residents of Oxford House West Hale lack. An expert retained by Defendant opined that a "head of household has the ability . . . in the case of fire safety, to ensure that people in th[e] house are not . . . doing things that might put other people at risk." (Doc. 79-7 at p. 5, ll. 9-13). Regarding the importance of a hierarchy, another expert retained by Defendant maintained that a hierarchy ensures that persons inside a single-family dwelling have "inherent responsibilities," causing the head of household to secure the safety of the other persons in the house in the event of a fire, rather than merely focusing on her own, independent safety. (Doc. 79-8 at p. 7, ll. 3-15).

According to Defendant, the residents of Oxford House West Hale do not have a "head or manager" or a hierarchal structure. In support of this contention,

Defendant directs the Court to the fact that Oxford Houses are democratically operated by the residents of each house, with each resident enjoying an equal vote in matters relating to house management. (*See* Doc. 79-16 at p. 5, l. 3). Although Oxford House West Hale – and all Oxford Houses – have five elected officers with specific duties, Defendant highlights the fact that those officers may only be elected to six-month terms. (*See id.* at p. 5, ll. 4-6). Defendant also alleges that the residents of Oxford House West Hale do not possess the requisite familiarity with each other to react to a fire in the manner that a "family" would react: an Oxford House resident in Louisiana typically moves out of her house after eleven months, (Doc. 79-19 at p. 8), and the rate of turnover may be even higher at Oxford House West Hale, (*see* Doc. 79-11).

The Court finds that the residents of Oxford House West Hale exhibit a social structure that mirrors a hierarchy, which would aid the safe evacuation of the structure in the event of a fire. Although the social structure is less formal than the traditional hierarchies found in many homes – for example, parent-child, grandparent-grandchild, or aunt-nephew – a hierarchal structure nonetheless exists among the residents, primarily based on the length of time that a resident has lived in the house. Daniel testified that because she "was pretty much the most knowledgeable, [she] had to . . . help the other people . . . and show people . . . how things [were] supposed to be." (Doc. 59-7 at p. 16, ll. 11-16). A portion of the *Congressional Record* relating to the debate on the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 (codified at 21 U.S.C. ch. 20), confirms that more

knowledgeable or older Oxford House residents provide a mentoring function within their houses: "Older residents make newer residents feel at home . . . . The most important function of older residents may be serving as role models . . . ." 134 Cong. Rec. 33,141 (1988). This informal hierarchy is buttressed by a more formal and familiar hierarchy: one of the residents of Oxford House West Hale serves as the "President" of the house. (*See* Doc. 59-6 at ¶ 4). The residents of Oxford House West Hale thus have both informal and formal social structures in the house that resemble the hierarchy that families traditionally exhibit.

Further, all of the residents of Oxford House West Hale are adults, and thus they do not require the level of supervision that a head of household otherwise would provide to children in a family. As an example of the importance of a head of household to ensuring a family's fire safety, Defendant's expert testified, "If my son brings a charcoal grill inside the house, as the head of household[,] I can tell him, 'You're not allowed to do that,' and I can have the grill removed from the house." (Doc. 79-7 at p. 5, ll. 4-7). The residents of Oxford House West Hale are adults and thus are sufficiently knowledgeable to understand that obvious fire hazards, like "bring[ing] a charcoal grill inside the house," must be avoided. (*Id.*). Therefore, even though the residents of Oxford House West Hale have social structures that resemble the hierarchy that families typically exhibit, the residents – because of their status as adults – have a lesser need for a hierarchy or head of household than a traditional family with children.

The Court also finds that the residents of Oxford House West Hale share a very close bond with each other and that they would react to a fire in a manner similar to a family. Catanese stated that the residents "always help one another out whenever anything comes up." (Doc. 59-6 at ¶ 8). Residents of Oxford House West Hale "become very close" with each other, (*id.* at ¶ 11), and they even maintain some of these tight-knit relationships after leaving the house,[24] (*see* Doc. 59-7 at p. 13, ll. 3-17), attesting to the quality and nature of these bonds of friendship. Catanese stated, "We . . . know all of each other's personal details, just like a family, and we hold each other accountable, just like a family." (Doc. 59-6 at ¶ 8). The portion of the *Congressional Record* relating to the debate on the Anti-Drug Abuse Act of 1988 confirms the existence of this familial relationship as well: "The house is like a family."[25] *Id.* at 33,144.

---

[24] Defendant disputes the extent to which Daniel enjoyed close bonds with the other residents at Oxford House, insofar as she testified at her deposition that she could not recall the names of certain residents and that she had not been in contact with some of her former housemates for extended periods of time. *See* Doc. 79-1 at ¶¶ 12-13 (citing Doc. 79-12 at pp. 3-5). Daniel testified at her deposition, however, that she indeed maintains contact with *some* women with whom she previously lived at Oxford Houses. *See* Doc. 59-7 at p. 12, ll. 22-25; *id.* at p. 13, ll. 1-13; *id.* at p. 65, ll. 6-15.

[25] The concept of "family" is not static. Over the course of the past fifty years, the Supreme Court consistently has expanded the scope of persons who deserve recognition as a "family" under the law: interracial spouses, *Loving v. Virginia*, 388 U.S. 1 (1967); extended relatives living under one roof, *Moore v. City of E. Cleveland*, 431 U.S. 494 (1977); and same-sex spouses, *Obergefell v. Hodges*, ___ U.S. ___, 135 S. Ct. 2584 (2015). "Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family." *Moore*, 431 U.S. at 504 (plurality opinion).

In more recent versions, the drafters of the Life Safety Code likewise have expanded the definition of "family." In 1985, the drafters interpreted "family," for purposes of the Life Safety Code, to mean "a social unit consisting of parents and children they rear, the children of the same parents, and one's husband (or wife) and . . . children they adopt." Nat'l Fire Prot. Ass'n, Life Safety Code Handbook 783-84 (3d ed. 1985). In 1997, however, the drafters of the Life Safety Code indicated that "[t]he definition of 'family' . . . may not be as narrow as" a definition that included only "a person or couple . . . and the children [that] they raise." Nat'l Fire Prot. Ass'n, Life Safety Code Handbook 665 (7th ed. 1997)

Because the residents of Oxford House West Hale comport themselves like a family, their level of fire safety is consistent with that of a family, and therefore the residents would not be placed in danger if Oxford House West Hale were to retain its status as a one-family dwelling. Michael J. Slifka ("Slifka"), a fire protection engineer who personally inspected the Oxford House West Hale structure, found that "[t]he residents of Oxford House[]West Hale have a reasonable, acceptable level of fire/life safety equal to any family related by blood, marriage[,] or adoption that may have several children . . . ." (Doc. 59-28 at ¶ III.E.4). Slifka further found that "[i]t would be reasonable to apply the life safety requirements found in the one-[]and two-family dwelling provisions of the Life Safety Code to Oxford House[]West Hale." (*Id.*)

In sum, the residents of Oxford House West Hale exhibit informal and formal social structures that resemble the hierarchies traditionally displayed by families, and the residents share a close bond with each other that prompts them to aid each other in times of need, as families tend to do. Because of these social structures and tight-knit relationships among the residents, the residents would react in a manner similar to a family in the event of a fire. Therefore, the accommodation that Plaintiffs requested – that the Fire Marshal interpret the term "family" in a manner that would capture the type of relationship shared among the residents of Oxford House West Hale – would not increase the potential danger to the residents that is presented by the risk of fire. Therefore, the requested accommodation is "reasonable" because it does not undermine the basic purpose of the Life Safety Code, nor does it undermine the Fire Marshal's statutory mandate to protect persons in Louisiana from injury due

to fire: the residents boast a level of fire safety that is comparable to the level of fire safety typically exhibited by a family. *See Oxford House*, 932 F. Supp. 2d at 692. Defendant thus has failed to demonstrate that there is a "genuine issue for trial" regarding the reasonableness of the requested accommodation. *Anderson*, 477 U.S. at 250.

### 4.  *Necessity of the Requested Accommodation*

Finally, the Court must determine whether the requested accommodation "may be necessary to afford" the residents of Oxford House West Hale "equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). "This requirement is divided into two considerations: is the accommodation necessary[,] and will the accommodation afford equal opportunity to the disabled?" *Oxford House*, 932 F. Supp. 2d at 693. "In order for a requested accommodation to be necessary, the plaintiff must show 'a direct linkage between the proposed accommodation and the equal opportunity to be provided to the handicapped person.'" *Id.* (quoting *Bryant Woods Inn, Inc. v. Howard Cty.*, 124 F.3d 597, 604 (4th Cir. 1997)). "If the requested accommodation 'provides no direct amelioration of a disability's effect,' it is not necessary." *Id.* (quoting *Bryant Woods Inn*, 124 F.3d at 604). Regarding the requirement that the accommodation afford "equal opportunity," the Fair Housing Act "does not require accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap." *Id.* (quoting *Bryant Woods Inn*, 124 F.3d at 604).

In addition to documentary evidence, (*see, e.g.*, Doc. 59-7 at p. 15, l. 22-25; *id.* at p. 16, l. 2; *id.* at p. 70, ll. 21-22; Doc. 59-6 at ¶ 7), empirical evidence establishes the effectiveness of the Oxford House model at preventing an individual's relapse into alcohol and drug use. *See* Leonard A. Jason et al., *The Need for Substance Abuse After-Care: Longitudinal Analysis of Oxford House*, 32 Addictive Behavs. 803 (2007). Residents of Oxford Houses are over four times more likely to retain their sobriety than other persons recovering from alcoholism or drug addiction. *See id.* In order for a particular Oxford House to exhibit this effectiveness, however, at least six otherwise unrelated persons who are recovering from alcoholism or drug addiction must reside together in the dwelling. (*See* Doc. 59-3 at ¶ 14). Therefore, the requested accommodation is "necessary" within the meaning of the statute because residency in an Oxford House directly ameliorates the effects of alcoholism and drug addiction, and at least six otherwise unrelated individuals who are recovering from alcoholism or drug addiction must reside together in a dwelling in order to achieve these ameliorative effects. *See Oxford House*, 932 F. Supp. 2d at 693.

Defendant argues that the Fire Marshal is not prohibiting the residents of Oxford House West Hale from living together; the residents simply must install various fire safety features in the Oxford House West Hale structure or relocate to a structure that already possesses such features. "The law dictates," however, "that a handicapped individual must be allowed to enjoy a *particular* dwelling, not just some dwelling somewhere in the town." *Id.* at 694 (quoting *Babylon*, 819 F. Supp. at 1185 n.10).

Without the requested accommodation, in order for the residents of Oxford House West Hale to remain in their existing dwelling and continue furthering their recovery, they would be required to install extensive and costly fire safety features – including a fire alarm system, an automatic sprinkler system, and single-station smoke alarms – to bring the Oxford House West Hale structure into compliance with the Life Safety Code's requirements for lodging or rooming houses. (*See* Doc. 59-26 at ¶¶ 3-7). The estimated cost to install a compliant fire alarm system at Oxford House West Hale is $2,800, (*see* Doc. 59-33);[26] however, the actual cost of installing the same system at a comparable four-bedroom home in Lake Charles was $6,355, (*see* Doc. 59-34). Depending on the precise provision of the Life Safety Code applicable to Oxford House West Hale, installation of a compliant automatic sprinkler system – which must provide a direct alarm signal transmission to the local fire department – was estimated to cost between $6,600 and $14,250. (*See* Docs. 59-33, 59-34). In connection with the installation of an automatic sprinkler system, additional plumbing and a backflow preventer also may be required to be installed, which was estimated to cost $6,500. (*See* Doc. 59-34). Plaintiffs did not obtain an estimate for the installation of single-station smoke alarms.

Additionally, the pipes that connect the Oxford House West Hale structure to the water main may require adjustment or replacement to accommodate the

---

[26] Defendant has not properly disputed these cost estimates; rather, Defendant merely "controverts" these estimates insofar as Plaintiffs "attempt to establish [their] own cost estimate[s] as . . . established fact[s, which] ha[ve] not been established." *E.g.*, Doc. 78-5 at ¶ 151. Defendant does not cite to any materials that tend to show that Plaintiffs' cost estimates are inaccurate, as is required by Rule 56(c). *See* Fed. R. Civ. P. 56(c)(1)(A).

necessary water flow for the automatic sprinkler system, thereby resulting in additional costs. (Doc. 59-8 at ¶ 7). Houses of similar age to the Oxford House West Hale structure do not have pipes that are large enough to accommodate such water flow, but Plaintiffs have not determined whether the relevant pipes of the Oxford House West Hale structure are sufficiently large. (*Id.*)

Neither Oxford House West Hale nor the residents of the house collectively have the financial means to install these fire safety features. None of the residents of Oxford House West Hale could afford a higher weekly payment than the $125 sum that is currently required, (Doc. 59-6 at ¶ 16), and due in large part to their previous addictions, the financial circumstances of most – if not all – of the residents of the house are bleak, (Doc. 59-4 at ¶ 21); an Oxford House resident in Louisiana earns, on average, less than $2,000 per month, (*see* Doc. 59-3 at ¶ 20). Further, at the time of Plaintiffs' Motion, Oxford House West Hale had less than $700 in its bank account, (*see* Doc. 59-6 at ¶ 14), and it has no alternative access to funding, (*see* Doc. 59-3 at ¶ 15). Thus, if required to install the fire safety features mandated by the Fire Marshal, Oxford House West Hale would be forced to cease its operations. (Doc. 59-6 at ¶ 15). In fact, far less costly expenses have forced the closure of various Oxford Houses in Louisiana. (*See* Doc. 59-4 at ¶ 23).[27]

---

[27] Moreover, even if the residents of Oxford House West Hale *could* amass the necessary funding to install the fire safety features in the house, neither the Millers nor any other landlord – barring extraordinary circumstances – would allow the residents to proceed with the installation of such features due to their unsightliness and the corresponding impact on the property's value. (*See* Doc. 59-8 at ¶¶ 10-11; Doc. 59-4 at ¶ 18). In the estimation of Lori Holtzclaw – the regional manager for Oxford House International, who has "negotiated hundreds of leases and lease renewals" and who has "dealt directly with hundreds of homeowners, property managers, and prospective landlords" – *no* landlord would permit the installation of such features, even in the unlikely event that the landlord incurred no expenses in the process. (Doc. 59-4 at ¶ 18).

Because of the vast costs associated with the fire safety features that the Fire Marshal is demanding that the residents of Oxford House West Hale install in order to continue to reside together in their home, the requested accommodation "may be necessary" to afford "equal opportunity" to the residents to "use and enjoy" the Oxford House West Hale structure; without the requested accommodation, the residents of Oxford House West Hale would be required to vacate the home due to the cost-prohibitive nature of installing the various fire safety features, which other persons would not be required to install in order to lease the same house. *See id.* (citing *Babylon*, 819 F. Supp. at 1185). Further, the benefit that is conferred by the requested accommodation – that more than three unrelated persons may reside together at Oxford House West Hale without the structure losing its status as a one-family dwelling – is *directly* related to the residents' handicaps: at least six otherwise unrelated individuals who are recovering from alcoholism or drug addiction must reside together in a dwelling in order to achieve the empirically proven ameliorative effects that the Oxford House model provides. *See id.* (citing *Bryant Woods Inn*, 124 F.3d at 604). (*See* Doc. 59-3 at ¶ 14). Defendant thus has failed to demonstrate that there is a "genuine issue for trial" regarding the necessity of the requested accommodation. *Anderson*, 477 U.S. at 250.

Plaintiffs therefore have demonstrated that there is "no genuine dispute as to any material fact" in connection with each element of their reasonable accommodation claims under the Fair Housing Act, the ADA, and the Rehabilitation Act: the residents of Oxford House West Hale are "handicapped" or "disabled" within the meaning of those terms under the statutes, Defendant denied their request for an accommodation, and their requested accommodation was both reasonable and necessary. Fed. R. Civ. P. 56(a). Without this accommodation, the residents of Oxford House West Hale could not live in their home due to the exorbitant costs that they would be required to incur, and their recovery from alcoholism and drug addiction thus would be hampered.

The common thread throughout this case is the concept of *danger*. Without the requested accommodation, the Oxford House West Hale residents' recovery from alcoholism and drug addiction – and perhaps even their lives – would be in danger. The requested accommodation – that the Fire Marshal interpret the term "family" in a manner that would capture the type of relationship shared among the residents of Oxford House West Hale – however, would not increase the potential danger to the residents that is presented by the risk of fire, and therefore Plaintiffs are entitled to their requested accommodation.

41

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that **Plaintiffs' Motion for Partial Summary Judgment (Doc. 59)** is **GRANTED**.  Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs are entitled to summary judgment on their reasonable accommodation claims under the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act, 42 U.S.C. ch. 45; the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. ch. 126; and the Rehabilitation Act of 1973, 29 U.S.C. ch. 16.

**IT IS FURTHER ORDERED** that the **Motion for Partial Summary Judgment (Doc. 55)** filed by Defendant H. "Butch" Browning, in his official capacity as the State Fire Marshal of the Louisiana Office of the State Fire Marshal, is **DENIED**.

Baton Rouge, Louisiana, this 24th day of July, 2017.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

42